UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------------x
UNITED STATES OF AMERICA,  :
: **MEMORANDUM & ORDER**
-against-  : 16-CR-550 (DLI)
:
LEE ANDREW PITTS,  :
:
Defendant.  :
----------------------------------------------------------------x

**DORA L. IRIZARRY, Chief United States District Judge:**

Defendant Andrew Lee Pitts is charged with attempted bank robbery pursuant to 18 U.S.C. § 2113(a). *See* Indictment, Dkt. Entry No. 11. On November 11, 2016, the government disclosed its intention to call expert witnesses regarding fingerprint and handwriting analysis. Gov't Ltr. dated Nov. 10, 2016, Dkt. Entry No. 16. On August 29, 2017, Defendant moved to preclude the government from offering expert opinion evidence that latent fingerprints and handwriting recovered at the crime scene are a match to the Defendant, and, alternatively, for an evidentiary hearing regarding the same. Mem. of Law in Support of Mot. to Suppress Opinion Testimony ("Mot."), Dkt. Entry No. 25; Reply to Resp. to Mot. to Suppress Opinion Testimony ("Reply"), Dkt. Entry No. 44. The government opposed Defendant's motion. Resp. in Opp'n ("Opp'n"), Dkt. Entry No. 43. For the reasons set forth below, Defendant's motion is denied in its entirety.

## BACKGROUND

On or around September 9, 2016, Defendant allegedly entered a branch of Chase Bank located at 22-30 31st Street, Astoria, New York, with the intent to rob the bank. *See* Compl., Dkt. Entry No. 1, at ¶ 3. Defendant approached the manager at a teller window and handed her a withdrawal slip that had written on it: "HAND OVER ALL 100, 50, 20 I HAVE A GUN I WILL SHOOT." *Id.* The manager told Defendant that she did not have any money. *Id.* Defendant then pointed at the note, and the manager again said that she did not have any money. *Id.* Defendant

then fled on foot without any money, leaving behind the withdrawal slip. *Id.* at ¶¶ 3, 5.[1] Latent fingerprints obtained from the withdrawal slip matched fingerprint impressions in a law enforcement database previously provided under the name "LEE A. PITTS." *Id.* at ¶ 5. The New York Police Department ("NYPD") arrested Defendant on September 21, 2016. *Id.* at ¶ 6.

On August 29, 2017, Defendant filed the instant motion pursuant to Rule 702 of the Federal Rules of Evidence ("FRE") and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), seeking to preclude the government from introducing expert opinion testimony as to latent fingerprint and handwriting analysis. *See generally*, Mot. Defendant simultaneously disclosed his intention to call three experts at a *Daubert* hearing and trial: (1) Simon Cole, Professor at the University of California, Irvine, Department of Criminology; (2) Nancy Franklin, Professor at Stonybrook University, Department of Psychology; and (3) David Stoney, Chief Scientist at Stoney Forensic. *See* Def.'s Ltr. dated Aug. 29, 2017, Dkt. Entry No. 30. Defendant's proposed experts would testify regarding "fingerprint methodologies and [the] psychology of identification." *Id.* At the time of the disclosure, Defendant had not yet secured a handwriting expert, and requested additional time to do so. *Id.*[2]

On September 7, 2017, the Court struck Defendant's August 29 letter and expert disclosure as insufficient. *See* Minute Entry dated Sept. 7, 2017. On September 12, 2017, Defendant filed a revised expert disclosure with additional information about the topics upon which his proposed experts would testify and the experts' respective *curricula vitae*. *See* Def.'s Ltr. dated Sept. 12, 2017, Dkt. Entry No. 33. Defendant filed additional expert disclosures with respect to Mr. Cole

---

[1] The Complaint alleges that Defendant participated in two additional attempted robberies not charged in the indictment.

[2] To date, Defendant has not identified any handwriting experts that he intends to call at trial.

on January 24, 2018. *See* Exhibit B to Opp'n (attachment to Def.'s Ltr. dated Jan. 24, 2018, Dkt. Entry No. 41, which does not appear on the docket).[3]

The government intends to call four experts from the NYPD at trial: (1) Latent Prints Detective Arthur Connolly, who initially identified the fingerprints at issue; (2) Detective Joseph Cooper, who verified Detective Connolly's identification; (3) Detective James Maloney, who performed a technical review of the fingerprint analysis; and (4) Criminalist Patricia Zippo, who is a handwriting examiner and concluded that Defendant "probably may have" written the demand note found at the crime scene. Opp'n at 2-4.

Defendant contends that recent reports by the President's Council of Advisors on Science and Technology ("PCAST") and the National Academy of Sciences ("NAS") call into question the reliability of fingerprint analysis and warrant the exclusion of such evidence. *See* Mot. at 8-10; Exhibit D to Declaration of Michael L. Brown II ("Brown Decl."), President's Council of Advisors on Science and Technology, *Forensic Science in Criminal Courts: Ensuring Scientific Validity of Feature-Comparison Methods* (2016) ("PCAST Report"), Dkt. Entry No. 29; Exhibit C to Brown Decl., National Research Council of the National Academies, *Strengthening Forensic Science in the United States: A Path Forward* (2009) ("NAS Report"), Dkt. Entry No. 28. Specifically, Defendant relies on the NAS Report's conclusion that the fingerprint analysis method of Analysis, Comparison, Evaluation, and Verification ("ACE-V") lacks scientific credibility. *See* Mot. at 10 (citing NAS Report at 143 ("We have reviewed available scientific evidence of the

---

[3] The government still maintains that Defendant's expert disclosures are insufficient under Rule 16(b)(1)(C) and (a)(1)(G) of the Federal Rules of Criminal Procedure. *See* Opp'n at 1. Although the Court has ordered Defendant on numerous times to provide the government with the information required under Rule 16, and Defendant's additional disclosure on January 24, 2018 as to Mr. Cole is quite brief, the Court concludes that Defendant's disclosure is adequate since it provides Mr. Cole's "opinions [and] the bases and reasons for those opinions." *See* Fed. R. Crim. Proc. 16(a)(1)(G); *United States v. McCloud*, 303 F. App'x 916, 917 (2d Cir. 2008) (rejecting challenge to expert disclosure that "summarized [experts'] testimony."). Since Defendant has not supplemented his disclosures with respect to Ms. Franklin and Mr. Stoney, those disclosures remain inadequate.

validity of the ACE-V method and found none.")). Defendant also contends that fingerprint analysis error rates are higher than jurors anticipate, and fingerprint analysts misleadingly claim that fingerprint analysis has a zero or near zero error rate. *See* Mot. at 8-10; Reply at 8-10. Although Defendant criticizes the government for not providing information regarding the NYPD's fingerprint analysis error rates (Mot. at 9), Defendant's motion generally is directed at the overall reliability of fingerprint analysis, and does not claim that the NYPD has made a misidentification in this case.

With respect to handwriting analysis, Defendant relies principally on the decision by the Hon. Jed S. Rakoff, United States District Judge for the Southern District of New York, in *Almeciga v. Center for Investigative Reporting, Inc.*, 185 F. Supp.3d 401 (S.D.N.Y. 2016). In *Almeciga*, the court relied on the NAS Report and precluded expert opinion testimony by a handwriting analyst on the basis that handwriting analysis fails the *Daubert* test since: (1) there are no studies testing its reliability; (2) it is not subject to peer review; (3) there is little information about error rates, and available information indicates that error rates are high; (4) it lacks objective standards; and (5) it lacks general acceptance among the scientific community. *See* Mot. at 15-16 (citing *Almeciga*, 185 F. Supp.3d at 419-23).

In opposition, the government points out that an addendum to the PCAST Report, which Defendant failed to identify in his opening brief, undermines many of Defendant's fingerprint analysis arguments. *See* Opp'n at 22-23 (citing Exhibit D to Opp'n, Addendum to PCAST Report ("PCAST Addendum")). The PCAST Addendum notes that, with "latent fingerprint analysis," PCAST found "clear empirical evidence" that "the method[ology] met the threshold requirements of 'scientific validity' and 'reliability' under the Federal Rules of Evidence." PCAST Addendum at 2. Additionally, the government argues that, although fingerprint analysts at one time testified

that their methodology has zero or near zero error rates, that is not what the current view among practitioners is, and not what the government's expert would testify to. Opp'n at 21-22.

With respect to handwriting analysis, the government argues that *Almeciga* is "meaningfully" distinguishable from the facts here. *Id.* at 33. *Almeciga* involved, *inter alia*, analysis of a forgery, which is a more difficult handwriting analysis with a higher error rate; testimony by an analyst infected with bias by the counsel that hired her; and a purported "scientific" identification without testimony as to the scientific basis for the identification. *Id.* at 35-38 (citing *Almeciga*, 185 F. Supp.3d at 413-26). The government also contends that the Advisory Committee Notes to the Federal Rules of Evidence provide that experience is a basis for qualifying an expert, and specifically reference handwriting experts as an example of experts qualified based on experience. *Id.* at 33 (quoting Fed. R. Evid. 702, 2000 Advisory Cmte. Note). The government requests that the Court deny Defendant's request for a *Daubert* hearing since courts in this Circuit routinely admit fingerprint and handwriting evidence. *Id.* at 26, 34-35. For the reasons set forth below, Defendant's motion is denied.

## DISCUSSION

### I. Legal Standard

Under Rule 702 of the FRE and the Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, the court acts a gatekeeper in determining the admissibility of purported expert testimony. To be admissible, expert testimony must "rest[] on a reliable foundation and [be] relevant to the task at hand." *Daubert*, 509 U.S. at 597. The court's inquiry is "a flexible one," *Id.* at 594, but Rule 702 requires that: (1) an expert have "scientific, technical, or other specialized knowledge [that] will help the trier of fact to understand the evidence or to determine a fact in issue"; (2) the testimony be "based on sufficient facts or data"; (3) the testimony be "the

product of reliable principles and methods"; and (4) an expert must "reliably appl[y] the principles and methods to the facts of the case," Fed. R. Evid. 702.

*Daubert* provides a nonexhaustive checklist of considerations in evaluating expert testimony, including whether the methodology: (1) has (or can be) tested; (2) has been subjected to peer review; (3) has a known error rate; (4) has controlling standards; and (5) has gained general acceptance in the scientific community. *Daubert*, 509 U.S at 593-94; *Nimely v. City of New York*, 414 F.3d 381, 395-96 (2d Cir. 2005). "Nothing requires a district court to hold a formal *Daubert* hearing in advance of qualifying an expert witness." *United States v. Ashburn*, 88 F. Supp.3d 239, 244 (E.D.N.Y. 2015) (citing *United States v. Williams*, 506 F.3d 151, 161 (2d Cir. 2007) ("While the gatekeeping function requires the district court to ascertain the reliability of [the expert's] methodology, it does not necessarily require that a separate hearing be held in order to do so.")).

This analytical framework recognizes that "our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002). "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596.

## II. Analysis

### A. Fingerprint Analysis

Defendant contends that the Court should preclude expert opinion testimony as to fingerprint analysis as wholly unreliable. This contention rests chiefly on the findings of the PCAST Report, the NAS Report, and several out-of-circuit court decisions that question the reliability of latent fingerprint analysis. *See* Mot. at 8-12. In opposition, the government argues that fingerprint analysis is widely admitted in courts across the country, and the findings of the

PCAST Report do not alter the landscape. Opp'n at 26-29. The Court is not persuaded by Defendant's argument.

The PCAST and NAS Reports raise a number of concerns with latent fingerprint analysis. First, error rates are much higher than jurors anticipate. PCAST Report at 9-10 (noting that error rates can be as high as one in eighteen); Mot. at 9 (citing Jonathan J. Koehler, *Intuitive Error Rate Estimates for the Forensic Sciences*, 57 Jurismetrics J. 153, 162 (2017) (noting that jurors estimate the error rate to be one in 5.5 million)). Second, the NAS Report concluded that the ACE-V method lacks scientific credibility, stating that: "We have reviewed available scientific evidence of the validity of the ACE-V method and found none." NAS Report at 143.

Defendant also suggests that fingerprint analysts typically testify that the methodology has a zero or near zero error rate. *See* Mot. at 10 (citing *United States v. Mitchell*, 365 F.3d 215, 246 (3d Cir. 2004) ("[S]ome latent fingerprint examiners insist that there is no error rate associated with their activities . . . . This would be out-of-place under Rule 702.")). These analysts reason that errors are either human or methodological, and, in the absence of human error, the methodology of fingerprint analysis is 100% accurate. *See* Exhibit B to Brown Decl., Simon A. Cole, *More Than Zero: Accounting for Error in Latent Fingerprint Identification*, 95 J. Crim. L. & Criminology 985, 1034-49 (2005) ("More Than Zero"). Finally, Defendant contends that the critiques in the PCAST Report and NAS Report demonstrate that fingerprint analysis has not gained widespread acceptance among the relevant community. Mot. at 11-12 (citing *United States v. Porter*, 618 A.2d 629, 643 n.26 (D.C. 1992) (noting that an NAS Report "can easily be equated with general acceptance of . . . methodologies in the relevant scientific community")).[4]

---

[4] Defendant notes that the Supreme Court, citing the NAS Report, has criticized the wide range of variability and reliability of the forensic sciences generally, including handwriting analysis. Mot. at 11-12 (citing *Melendez-Diaz*

The Court is dismayed that Defendant's opening brief failed to address an addendum to the PCAST Report, which casts fingerprint analysis in a more scientific light and undercuts Defendant's argument. *See* Exhibit D to Opp'n, Addendum to the PCAST Report on Forensic Science in Criminal Courts ("PCAST Addendum")). While the PCAST Addendum reinforced the need for empirical testing of fingerprint analysis and other forensic methods, noting that "experience and judgment alone—no matter how great—can *never* establish the validity or degree of reliability of any particular method," it also "applaud[ed] the work of the friction-ridge discipline" for steps it had taken to confirm the validity and reliability of its methods. *Id.* at 3-4 (emphasis original). The PCAST Addendum further concluded that "there was clear empirical evidence" that "latent fingerprint analysis [. . .] method[ology] met the threshold requirements of 'scientific validity' and 'reliability' under the Federal Rules of Evidence." *Id.* at 2. This conclusion significantly undermines many of Defendant's criticisms of the methodology of latent fingerprint analysis.

The views of the courts in this and other circuits are consistent with the views expressed in the PCAST Addendum. Fingerprint analysis has long been admitted at trial without a *Daubert* hearing. *United States v. Stevens*, 219 F. App'x 108, 109 (2d Cir. 2007) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)) (affirming denial of request of *Daubert* hearing and holding that "[s]uch a hearing is not required 'in ordinary cases where the reliability of an expert's methods is properly taken for granted.'"); *United States v. Salameh*, 152 F.3d 88, 128-129 (2d Cir. 1998) (affirming admission of fingerprint evidence); *See also United States v. Avitia-Guillen*, 680 F.3d 1253, 1260 (10th Cir. 2012) ("Fingerprint comparison is a well-established method of

---

*v. Massachusetts*, 557 U.S. 305, 320-21 (2009)). *Melendez-Diaz*, however, did not deal with fingerprint or handwriting analysis. 557 U.S. at 320 (critiquing expert affidavits as to whether a substance was cocaine).

identifying persons, and one we have upheld against a *Daubert* challenge."). The Court sees no reason to preclude such evidence here.

The Court finds the government's citation to *United States v. Bonds*, 2017 WL 4511061 (N.D. Ill. Oct. 10, 2017) instructive. The court in *Bonds* reviewed the same arguments presented here: that the PCAST Report renders fingerprint analysis inadmissible. *Id.* at *2. The court rejected the argument that the ACE-V method is unreliable, noting that: (1) "the PCAST Report found that 'latent fingerprint analysis is a foundationally valid subjective methodology—albeit with a false positive rate that is substantial and likely to be higher than expected by many jurors . . .'" and (2) "information concerning false positive rates, in addition to the other concerns raised in the PCAST Report . . . goes to the weight of the fingerprint evidence, not its admissibility." *Id.* at *2. The court further noted that "the PCAST Report presents only advisory recommendations concerning validity as applied," and that "[t]o the extent [defendant] determines that [the examiner] did not comply with the recommended PCAST procedures, [defendant] can raise these concerns on cross-examination." *Id.* at *3.[5]

Additionally, the government's opposition claims that its fingerprint experts do not intend to testify that fingerprint analysis has a zero or near zero error rate. Opp'n at 18. While the government concedes that experts at one time claimed that the error rate was zero, recent guidance instructs experts to have familiarity with error rates and the steps taken to reduce error rates, and "'not [to] state that errors are inherently impossible or that a method inherently has a zero error rate.'" *Id.* at 21-22 (quoting Nat'l Institute of Standards and Tech., *Latent Print Examination and*

---

[5] Defendant faults the government for not disclosing to him "error rates of the NYPD Latent Fingerprint Section, its accreditation status, or inconsistencies across examiners." Mot. at 9. To the extent this information has not been provided to Defendant, the Court orders the government to produce it in a timely fashion.

9

*Human Factors: Improving the Practice through a Systems Approach* (2012), http://www.nist.gov/oles/upload/latent.pdf (last visited Feb. 26, 2017)). Thus, Defendant's critiques appear to be misplaced.[6]

The Court does not take the position that fingerprint analysis is *per se* admissible. To be sure, the PCAST and NAS Reports note a number of areas for improvement among the forensic sciences, and a number of courts have criticized forensic sciences as potentially lacking in the "science" aspect. *See, e.g.*, *Melendez-Diaz*, 557 U.S. at 320-21. However, Defendant has not made a sufficient showing in this case that his critiques go to the admissibility of fingerprint analysis, rather than its weight. Accordingly, Defendant's motion to preclude the admission of expert opinion testimony with respect to fingerprint analysis is denied.

### B. Handwriting Analysis

In arguing for the preclusion of expert testimony regarding handwriting analysis, Defendant relies almost exclusively on the *Almeciga* decision, which is not binding on this Court. *See* Mot. at 14-17 (citing *Almeciga*, 185 F. Supp.3d at 419-26). The government contends that *Almeciga* is factually distinguishable. Opp'n at 35-38. The Court agrees with the government.

The handwriting analysis in *Almeciga* raised a number of reliability issues that are not present here. First, the plaintiff in *Almeciga* tasked the analyst with determining whether plaintiff's signature on a contractual release was a forgery. *Id.* at 414. Forgery analysis is markedly more

---

[6] The Court notes that while judicial and academic criticism of error rates continues to the present day, the only authority Defendant cites with respect to testimony regarding "zero" error rates predate the 2012 guidance cited by the government. *See* Mot. at 10 (citing *Mitchell*, 365 F.3d at 246); *See also* More Than Zero at 1034-49. While Defendant's citation to the 2016 trial testimony of an NYPD latent fingerprint examiner that identified an individual to the exclusion of all others in *United States v. Walker*, 15-CR-388 (JBW) (E.D.N.Y. 2016) appears to be inconsistent with the government's position here, that testimony was by an examiner who is not testifying in this case. *See* Reply at 16. Additionally, the only prior testimony by Detective Connelly that Defendant identifies predates the 2012 guidance regarding error rate testimony by approximately five years. *See Id.* at 16 n.10 (citing *Winkfield v. Duncan*, 12-CV-3237 (ARR) (E.D.N.Y. 2012)) (noting that testimony was in 2007).

difficult than comparing typical signatures and has considerably higher error rates than simpler comparisons. *Id.* at 422 (citation omitted) ("[W]hile forensic document examiners might have some arguable expertise in distinguishing an authentic signature from a close forgery, they do not appear to have much, if any, facility for associating an author's natural handwriting with his or her disguised handwriting."). Second, the expert performed her initial analysis without any independent knowledge of whether the "known" handwriting samples used for comparison belonged to the plaintiff. *Id.* at 414. Third, the expert conflictingly claimed that her analysis was based on her "experience" as a handwriting analyst, but then claimed in her expert report that her conclusions were based on her "scientific examination" of the handwriting samples. *Id.* at 419. Fourth, the court noted several instances of bias introduced by plaintiff's counsel. *Id.* at 424. For example, counsel initiated the retention by providing a conclusion that "'[t]he questioned document was a Release that Defendant CIR forged.'" *Id.* Fifth, the expert contradicted herself in numerous respects, including by stating that her conclusions were verified when they were not, and claiming both that the signature on the questioned document was "'made to resemble' plaintiff's" and also that the signatures were "'very different.'" *Id.* at 426. Given these significant factual differences from the instant case, the Court finds *Almeciga* inapposite and unpersuasive.

As the parties correctly note, the Second Circuit Court of Appeals has not addressed directly the admissibility of handwriting analysis. *See* Mot. at 14 (citing *United States v. Adeyi*, 165 F. App'x 944, 945 (2d Cir. 2006) ("Our circuit has not authoritatively decided whether a handwriting expert may offer his opinion as to the authorship of a handwriting sample, based on a comparison with a known sample."); *United States v. Brown*, 152 F. App'x 59, 62 (2d Cir. 2005) ("[O]ur own court has not addressed the issue . . . [of] expert handwriting analysis [admissibility].")). Courts in this district, however, routinely admit handwriting evidence. *See,*

*e.g.*, *United States v. Tarantino*, 2011 WL 1113504, at *7-8 (E.D.N.Y. Mar. 23, 2011) ("Subject to *voir dire* of the analyst's expert qualifications, the Court will permit the analyst to describe for the jury the similarities and differences between the Defendant's exemplar and the handwritten notes."); *United States v. Brooks*, 2010 WL 291769, at *3 (E.D.N.Y. Jan. 11, 2010) ("[H]andwriting analysis is sufficiently reliable under *Daubert* and [Rule 702]."); *United States v. Jabali*, 2003 WL 22170595, at *2 (E.D.N.Y. Sept. 12, 2003) (citation omitted) ("Blanket exclusion [of handwriting analysis] is not favored, as any questions concerning reliability should be directed to weight given to testimony, not its admissibility.").[7]

Here, Defendant has not demonstrated that the government's expert testimony regarding handwriting analysis warrants preclusion. Indeed, most of Defendant's briefing argues for wholesale exclusion of handwriting analysis, which is not the majority view in this Circuit. *See Brown*, 152 F. App'x at 62-63 (citations omitted) ("[W]e have routinely alluded to expert handwriting analysis without expressing any reservation to its admissibility under Rule 702." (collecting cases)). As the Second Circuit has recognized, handwriting analysis is one area in which a juror, in some, but not all cases, may be as adept as an expert at comparing handwriting samples. *See United States v. Tarricone*, 21 F.3d 474, 476 (2d Cir. 1993) ("[The] jury could, on its own, recognize that the handwriting on the throughput agreement was not Barberio's."). Therefore, "there is little reason to be concerned that a jury will place undue weight on the expert's ultimate opinion without carefully scrutinizing the basis for his conclusion." *Brown*, 152 F. App'x 59, at 63 (noting that "handwriting comparison is more readily comprehensible to a jury than ther

---

[7] Aside from *Almeciga*, which is distinguishable from the present case, Defendant does not cite any authority excluding expert testimony on handwriting analysis. *United States v. Hines*, 55 F. Supp.2d 62, 69 (D. Mass 1999) admitted the opinions of a handwriting expert except as to authorship—which is not the law of this Circuit—and *United States v. Rutherford*, 104 F. Supp.2d 1190, 1194 (D. Neb. 2000) similarly admitted the handwriting expert's testimony, except as to authorship and the degree of certainty of his conclusions.

fields of forensics analysis"). Given the liberal standard under *Daubert* and Rule 702 and the numerous cases in this district and circuit admitting expert opinion testimony regarding handwriting analysis, the Court concludes that preclusion is neither appropriate nor warranted.

Moreover, Defendant's critiques go to the weight of the evidence, not its admissibility. Defendant's concerns with the NYPD's error rates in handwriting analysis and whether the NYPD's examiners have (and followed) procedures to ensure the reliability of their analysis are not bases for preclusion. *See* Reply at 15-17. A party is "free to challenge the reliability of the evidence, to minimize its importance, or to argue alternative interpretations of its meaning, but these and similar other challenges go to the *weight* of the evidence[,] not its *admissibility*." *United States v. Yin Yat Chin*, 371 F.3d 31, 38 (2d Cir. 2004) (emphasis original). The Court is confident that Defendant can adequately address these, and any other of the critiques courts and academics have identified with handwriting analysis, through vigorous cross-examination and the presentation of contradictory evidence.[8] *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."). Accordingly, Defendant's motion to preclude expert opinion testimony regarding handwriting analysis is denied.

---

[8] As the Court noted in footnote 2, *supra*, Defendant has not provided any expert disclosures as to handwriting experts. As such, Defendant may find himself precluded from presenting such evidence at trial.

13

## **CONCLUSION**

For the reasons set forth above, Defendant's motion is denied in its entirety, and Defendant's request for a hearing is denied.

SO ORDERED.

Dated: Brooklyn, New York
       February 26, 2018

                                                     /s/
                                    DORA L. IRIZARRY
                                        Chief Judge